■ DORIS G. HARRISON, Individually and as Executrix of MARTIN P. HARRISON, Deceased, Respondent, v MARTHA A. DOMBROWSKI, as Executrix of EDMUND B. DOMBROWSKI, Deceased, et al., Appellants.—Judgment, Supreme Court, Bronx County (Lewis R. Friedman, J.), entered July 25, 1990 in the sum of $1,201,260 after a jury verdict finding in favor of plaintiff against defendants in a larger amount and reduced by plaintiff's stipulation to accept the judgment sum, reversed, on the law and the facts, without costs or disbursements and a new trial ordered solely on the issue of damages, unless plaintiff, within 20 days after service upon her attorney of a copy of the order to be entered herein, with notice of entry, serves and files in the office of the clerk of the trial court a written stipulation consenting to reduce the verdict in favor of the plaintiff to the principal amount of $692,200 and to entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment, as so amended and reduced, is affirmed, without costs or disbursements.

This is an action for wrongful death and conscious pain and suffering arising out of the alleged medical malpractice of two defendant physicians, both deceased. At trial, plaintiff established that defendants, a neurologist and an internist, had been negligent in failing to diagnose Martin P. Harrison, plaintiff's decedent, as suffering from normal pressure hydrocephalus, a treatable condition of the brain, rather than Alzheimer's disease, which is progressive and incurable. Plaintiff's proofs established that normal pressure hydrocephalus could have been ameliorated in Mr. Harrison's case by the implantation of a shunt to drain off excess brain fluid.

Plaintiff showed through expert testimony that defendants' negligence caused the decedent's death, and that if a timely diagnosis had been made and appropriate shunt surgery undertaken, his memory loss and dementia symptoms could have been alleviated and plaintiff's life prolonged.

The jury returned a verdict in favor of plaintiff and against both defendants and apportioned liability between them. The jury awarded itemized damages as follows:

| | | |
|---|---|---:|
| pain and suffering | – $ | 400,000 |
| lost earnings | – $ | 50,000 |
| wrongful death | – $ | 1,000,000 |
| lost services | – $ | 250,000 |

On defendants' post-trial motion pursuant to CPLR 4404, the trial court reduced wrongful death damages to $300,000. Plaintiff stipulated to accept the reduction, and judgment was entered accordingly.

We perceive no reason to disturb the jury's findings as to liability, apportionment, or pain and suffering. However we conclude that the damages awarded were excessive and unsupported by the evidence in three categories.

Lost Earnings: When Mr. Harrison first consulted defendants about two years before his death, he was sixty-four years old and earning approximately $440 a month. There was no proof that decedent could have returned to his more lucrative prior employment as an advertising salesman, and nothing to support the lost earnings awarded by the jury of $50,000 for the relevant two-year period. While under defendants' care, decedent worked at his messenger job until February, 1983, when he became physically unable to continue; he died approximately five months later in July, 1983. The maximum damages for lost earnings must therefore be limited to the sum of $2,200. Any greater award would be impermissibly based on pure speculation (Naveja v Hillcrest Gen. Hosp., 148 AD2d 429; Marmo v Southside Hosp., 143 AD2d 891).

Lost Services: The jury award of $250,000 in this category was grossly excessive. Plaintiff's attorney did not even address the subject of the services performed by the decedent on his direct examination of the plaintiff, and broached this topic only as an afterthought on redirect, when he asked the plaintiff what the decedent did around the house before he became ill. The plaintiff's response, which is the sole evidence concerning the services performed by the decedent, is as follows:

"Well, he was good at painting, hanging paper. He had a yearly thing for fixing the roof. He would go to the stores for me, do the gardening. He liked to go out and see the neighbors and fix the flowers. He liked to try his hand at carpentry. I didn't think he was too good. He liked to do that, though. That was about it.

"Q. Anything else?

"A. Well, anything—he would try things, everybody had to try things.

"Q. After he got sick did he do any of those things?

"A. No, no."

Another consideration mandates a substantial reduction of the lost services recovery. Plaintiff's basic complaint against defendants was not limited to misdiagnosis but rested upon defendants' failure to prescribe and carry out shunt surgery of their patient's brain. Concededly, virtual total disability resulting from such significant surgery would have lasted a man of decedent's age at least a year. Thus on plaintiff's own theory of her case she lost decedent's services by reason of defendants' negligence for no more than one year. Thus we fix the maximum recovery for plaintiff in this category at $50,000.

Set-Off: Plaintiff commenced this action in April, 1984. Originally named as defendants, in addition to defendants at trial, were the Hospital of the Albert Einstein College of Medicine and Dr. Leon Thal, a neurologist who treated the decedent subsequent to his treatment by defendants. Plaintiff settled her claims against Dr. Thal and the Hospital for a total of $60,000 in June, 1988.

On this record, it was error for the trial court to refuse to reduce the amended gross award for wrongful death by the $60,000 settlement paid by these settling joint tortfeasors (General Obligations Law § 15-108 [a]; *Bonnot v Fishman,* 88 AD2d 650, *affd* 57 NY2d 870; *see, Killeen v Reinhardt,* 71 AD2d 851). We conclude on the evidence at trial that this settlement was in satisfaction of plaintiff's wrongful death cause of action and not attributable to the conscious pain and suffering claim.

Thus we conclude an additional remittitur of plaintiff's damages in the sum of $307,800 is mandated, and that the components of plaintiff's recoverable damages cannot exceed the following:

| | |
|---|---|
| pain and suffering | $400,000 |
| lost earnings | 2,200 |
| wrongful death | 240,000 |
| lost services | 50,000 |
| Total principal award | $692,200 |

Concur—Carro, J. P., Wallach and Kupferman, JJ.

Milonas, J., dissents in a memorandum as follows: Plaintiff Doris G. Harrison commenced this medical malpractice action as executrix of her husband's estate and in her own right against defendant physicians, now both deceased. In that regard, Martin Harrison first consulted Dr. Louis Imperato in

December of 1980 as a result of his increasing loss of memory. Dr. Imperato perceived indications of dementia and referred him to a neurologist, Dr. Edmund B. Dombrowski. The two defendant doctors concluded that he was suffering from Alzheimer's disease and that there was nothing that they could do for him. Martin Harrison died in July of 1983 after two and one-half years of mental and physical deterioration.

Dementia can be caused by either strokes, a brain tumor, Alzheimer's disease or normal pressure hydrocephalus (NPH). There are medically accepted tests to determine which condition is responsible for the dementia. Further, it is undisputed that NPH is treatable with the degree of success directly related to how early the diagnosis is made. Defendants, however, never performed the appropriate tests on Harrison to ascertain the existence of a treatable illness but simply decided without clinical proof that he was a victim of Alzheimer's disease. Harrison's true condition was not discovered until shortly before his death when his daughter, a hospital nurse, had him examined by a new physician, who finally undertook some fibroid and blood tests, as well as a CAT scan. Even defendants' own expert witness admitted that the ultimate finding of NPH was justified based upon the medical evidence.

Following a trial conducted in connection with this matter, the jury returned a verdict of liability and awarded monetary damages of $400,000 for the decedent's conscious pain and suffering, $50,000 for his loss of wages, $1,000,000 for wrongful death and $250,000 for the spouse's loss of services. The trial court, pursuant to defendants' post-trial motion to set aside the verdict, granted the application for a new trial unless plaintiff was willing to accept a reduction in the sum of damages for wrongful death to $300,000, and plaintiff subsequently agreed to the lesser amount. Now the majority have decided to decrease and fine prune the award even further, in effect substituting their judgment for that of the jury and the Trial Judge, who were in the best position to assess the credibility of the witnesses and generally evaluate the weight of the evidence. In that connection, the proof at trial was sufficient to remove plaintiff's claims for damages from the realm of impermissible speculation (see, Greasy Spoon v Jefferson Towers, 75 NY2d 792).

Certainly, the jury's award herein does not deviate materially from what would be reasonable compensation under CPLR 5501 (c) (Christopher v Great Atl. & Pac. Tea Co., 76 NY2d 1003). In regard to the $50,000 in damages for loss of wages, the decedent's annual salary as a salesman was be-

tween $25,000 and $28,000 in the 1960's when this was a comparatively good income. Thus, the jury was warranted in concluding that if not for defendants' undisputed negligence in misdiagnosing and mistreating the deceased, thereby causing him to slowly deteriorate and suffer and, consequently, compelling him to continue working as a runner for Merrill Lynch at $125 per week (since there was little else that he could do at this point), he would have been able to earn at least $50,000 in the 2½ years preceding his death. Contrary to the characterization of the majority, the jury's decision was not based upon mere speculation but was a logical determination derived from a reasonable appraisal of the evidence. As for the jury's award with respect to loss of services, the proof clearly demonstrated that the decedent had always supported his wife financially, and after his disability she was forced to find work and ended up as a companion for an elderly woman. In addition, she lost her husband's assistance with the household chores and other responsibilities. As the trial court aptly noted, this case involved the loss of services to a wife whose life-long dependence on her husband was tragically disrupted. Under these circumstances, $250,000 is not unreasonable compensation pursuant to CPLR 5501 (c).